IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | |
|---|---|
| VINSCENT MINOR,     )<br>     Plaintiff,     )<br>          )     Cause No. 1:19-cv-183<br>     v.     )<br>          )<br>UNITED STATES OF AMERICA,     )<br>     Defendant.     )     | |

**DEFENDANT'S REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

As a preliminary matter, as set forth in Defendant's Memorandum in Support of Its Motion to Strike Plaintiff's Response (DE 27), Plaintiff has failed to comply with Federal Rule of Civil Procedure 56(c) and Northern District of Indiana Local Rule 56-1(b).  Therefore, Defendant's statement of material facts, set forth in its Memorandum in Support of Motion for Summary Judgment, should be deemed admitted and accepted by the Court as the undisputed material facts in this matter.   If the Court does not grant Defendant's motion to strike, in full or in part, the Defendant requests the Court allow it to file additional pages as part of its Reply because of the burden and prejudice placed on Defendant in its ability to ascertain from Plaintiff's response which, if any, material facts Plaintiff disputes.

*The Most Relevant Undisputed Material Facts*

Plaintiff has not shown that there are any material facts in dispute as it relates to the untimely filing of the administrative claim.  Indeed, the majority of Plaintiff's exhibits have no bearing on the relevant inquiry of what Plaintiff knew and when[1]. Nothing in the below stated medical time line has been disputed by Plaintiff.

---

[1] Plaintiff has submitted documents from the Administrative Investigations Board's (AIB) investigation into Dr. John Burns.  The AIB's investigation occurred after Plaintiff's surgery and investigated only Dr. Burns' oversight of the podiatry department.  Likewise, Plaintiff submitted the 30(b)(6) deposition of Nicole Gust, Dr. Hammersley's removal letter, portions of Dr. Hammersley's deposition transcript, and other VA memorandums.  Plaintiff also points to the

**January 21, 2015**: Dr. Hammersley told Plaintiff after surgery he would be able to run and jump. (Def.'s Ex. 2 p. 16, lines 9-13, 18-24, and p. 17, lines 7-11).

**July 31, 2015**: Plaintiff had surgery with Dr. Hammersley that included the installation of screws into this foot. (Def.'s Ex. 1, p. 6).

**August 10, 2015:** Plaintiff has follow up visit with Dr. Hammersley. (Def.'s Ex. 3 p. 2).

**August 27, 2015:** Plaintiff denied pain and discomfort at his follow-up visit with Dr. Hammersley. (Pl.'s Ex. 1, p. 7; Def.'s Ex. 3, p. 4).

**September 10, 2015**: Plaintiff reports some tenderness in his heel and requests cushioned heel. (Def. Ex. 3, p. 6).

**October 13, 2015**: Plaintiff reports that he is happy that his foot feels better and his is glad he had the procedure. It was at this same appointment that Plaintiff made plans to have his right foot operated on once his left foot healed. (*Id*. at p. 7). On the same date, following his appointment with Dr. Hammersley, Plaintiff has a physical therapy appointment with Rey Sebastian and tells him that he just saw Dr. Hammersley and Dr. Hammersley commented that he is "right where he should be." (Def.'s 3 Ex. pp. 9-10).[2]

**November 9, 2015:** Plaintiff continued to make gains in his range of motion. (Pl.'s Ex. 1, p. 9).

**November 16, 2015**: Plaintiff states that he is satisfied with correction and reports progress. (Def.'s Ex. 3, p. 13).

**November 23, 2015**: Plaintiff reported to his physical therapist that he was assured that the persistent ankle pain on the medial aspect during inversion and vice-versa likely is part of his healing and will improve over time. Plaintiff was determined to be progressing well. (Def.'s Ex. 3, pp. 14-16).

**December 7, 2015**: Plaintiff reports frustration with left ankle pain and decreased mobility to his physical therapist. (Def.'s Ex. 3, p. 17).

**December 21, 2015**: Plaintiff told his physical therapist that his foot was "all jacked up." (Def.'s Ex. 1, p. 8)

---

fact that he was one of many Veterans alerted to possible malpractice by Dr. Hammersley. However, none of this sheds light on the Plaintiff's knowledge or the timing thereof, and therefore cannot create a genuine issue of material fact of the same.

[2] This October 13, 2015, date also shows that Plaintiff did not make the decision to have surgery on his right foot "despite" increased pain. (*See* Pl.'s Br. ¶ 16). Plaintiff agreed to have surgery on his right foot on October 13, 2015, before reporting increased pain and difficulty walking, and before discovery of the protruding screw. (Pl.'s Ex. 1, p. 8).

**January 11, 2016**: Plaintiff tells his physical therapist that nothing has changed with his condition and continues to consistently complain of significant pain over medial and lateral aspect of left ankle. Plaintiff's wife reported that she could feel a screw in the Achilles tendon region. (Def.'s Ex. 3, p. 20).

**January 21, 2016**: Plaintiff reported increased pain and difficulty walking *over the last month*. Dr. Hammersley ordered x-rays, which showed that the screw was misplaced. Surgery was planned to remove the screw. (Def.'s Ex. 1, p. 10).

**February 16, 2016:** Plaintiff has his initial visit with Dr. Keyes, where his chief complaint was "painful loosening screws in left foot." (*Id.* at p. 23-24, 28).

**February 18, 2016**: Plaintiff informed Dr. Hammersley that he was having the screws removed by another non-VA provider. (Def.'s Ex. 3, p. 25).[3]

Notably, the following facts concerning increased pain in Plaintiff's foot are uncontroverted by Plaintiff's response:

- On January 21, 2016, Plaintiff saw Dr. Hammersley and was diagnosed by Dr. Hammersley as having, in relevant part, prominent screw posterior left calcaneus and planned on hardware removal. (Def.'s Ex. 1, p. 10). Plaintiff told Dr. Hammersley that he had pain, and Dr. Hammersley told Plaintiff that the positioning of the screws were not all the way in and that it was a problem and that they were not properly in there. (*Id.*; Ex. 2, 49:3-49:14).

- On February 16, 2016, Plaintiff visited Dr. Lindsay Keyes, a non-VA podiatrist, for "painful loosening screws in the left heel." (Def.'s Ex. 1, p. 23). Per Plaintiff, Dr. Keyes was frustrated by the placement of the screws and how they were not all the way in which was improperly done. Dr. Keyes told Plaintiff that the screws were "improperly done." (*Id.*). Plaintiff voluntarily elected to see Dr. Keyes under the Veterans' Choice Program. (*Id.* and Ex. 2 p. 35, lines 17-30, and p. 36, lines 1-11).

- On February 24, 2016, Plaintiff had the screws removed by Dr. Keyes and had no more pain in that area of his foot. (Def. Ex. 1, pp. 26-27; Def. Ex. 2, p. 67. lines 1-11).

- On April 14, 2016, Plaintiff saw, Dr. Cain, another outside provider, presenting with left foot pain, complaining of pain on the inside of his ankle especially when he moves his foot up and down, but sometimes his whole foot hurts. Dr. Cain notes that Patient told him that he had surgery by Dr. Hammersley in the past and his foot has never recovered since then. Dr. Cain states that Patient has a lot of trouble walking and standing on the foot. It

---

[3] Defendant in its memorandum stated January 21, 2016, was Plaintiff's last visit with Dr. Hammersley. However, Plaintiff actually had one more follow up visit and told Dr. Hammersley he was having surgery to remove the screws with a non-VA Podiatrist.

      is very painful at all time and nothing relieves the pain. He states he cannot pull his foot towards him since the surgery was done. (Def. Ex. 1, p. 29-30)

- On April 18, 2016, Plaintiff talked to a VA social worker about his severe foot pain. (*Id*. at p. 20). The social worker noted that Plaintiff told her that he had surgery by Dr. Hammersley, that he found out he had screws sticking out of his foot, that his foot is messed up and no one wants to touch it, that his primary care physician apologized to him for the condition of his foot and how it was done, that Dr. Keyes will not touch his foot and does not want any referrals from vets who have been operated on by Dr. Hammersley, that he is expecting an increase in service connection if his functioning is going to be like this, that they have a lawyer and do not want to be strung along, and he intended to write a congressman. (*Id*.).

    As argued in Defendant's memorandum, the undisputed facts demonstrate that Plaintiff had enough knowledge to suspect that Dr. Hammersley was the cause of his injury, and this is particularly true in light of the fact that Plaintiff's post-surgery condition did not conform to his or his physician's reasonable expectations. Dr. Hammersley told Plaintiff that after his surgery, he would be able to run and jump; and Plaintiff expected to be able to run, leap and have fun after his surgery. Instead, even after the screws were out, Plaintiff continued to have pain in other areas of his foot, deformity in his foot, and mobility problems which did not exists prior to surgery. The other post-surgery problems that Plaintiff experienced in his left foot would have prompted a reasonable person to suspect that other aspects of the surgery, in addition to the screw, were improper and make further inquiry.

    The facts stated above, along with Plaintiff's other deposition testimony, indisputably establish that starting in December of 2015 Plaintiff (1) experienced significantly increased pain; (2) had a foot deformity he did not previously have; (3) had functional foot problems he did not previously have; and (4) had severe pain from screws coming out of the back of his heal. All of these occurred after Plaintiff's surgery with Dr. Hammersley.

    It is difficult to imagine that someone who experienced such dramatic changes and was actually told by non-VA doctor in February 2016, that the placement of the screws in his foot

4

was improper, would not have made further inquiry in order to timely file a claim. Surely, a reasonable person in Plaintiff's position would have. It is also evident that Plaintiff knew that Dr. Hammersley was the cause of his post-surgery problems on March 2, 2016, the date Plaintiff made his VA ER visit with Dr. Price and refused a referral back to VA Podiatry because of mismanagement by the VA Podiatry. At the very latest, Plaintiff knew of his injury and its cause on April 16, 2016, when, two days after being told by Dr. Cain that he needed another surgery, he asked the social worker to help him navigate the VA system to address service connection disability issues which began when a podiatrist caused severe damage to his left foot. The only reasonable inference from these undisputed facts is that by February 2016, Plaintiff knew he had an injury and the injury was caused by Dr. Hammersley's improper placement of the screws.

*Plaintiff Failed to Address in His Response the Most Telling Facts of Knowledge of Injury and Time Which Started the Accrual Period for the Untimely Claim*

Plaintiff was expressly told by Dr. Lindsey Keyes ("Dr. Keyes") on February 16, 2016, more than two years before he filed his SF95, that the screws Dr. Bradley Hammersley ("Dr. Hammersley") surgically installed in his foot were "improperly done."[4] (Def.'s Ex. 2, 49: 10-14, 50:14-17; Deposition Ex. 1, p. 5). Alone, this fact shows that Plaintiff had knowledge his injury had a doctor-related cause more than two years before he filed his administrative tort claim on July 23, 2018, and demands summary judgment in favor of the United States. Also, the pain from the injury of the improper placement of the screws was well known by Plaintiff as demonstrated in his deposition wherein he testified:

> Q. And in fact, when Dr. Keyes removed those screws in March (actually February 24, 2016, Def.'s Ex. 1, p. 26; Def's Ex. 2, p. 38, lines 20-25), you experienced a lot less pain?

---

[4] Although Plaintiff asserts that Dr. Keyes never told him that the surgery in its totality was unnecessary or improperly done, he testified that Dr. Keyes informed him that the portion of the surgery causing him pain, the screws, had been "improperly done." (*See* Def.'s Ex. 2, 49:3-49:14; 50:14-17; 50:23-51:3). Thus, there is no issue of material fact as to whether Dr. Keyes told Plaintiff that the screws specifically were "improperly done."

5

> A. In that area, yes, sir.
> Q. So surgery in July, and you said you experienced pain since surgery; correct? I believe that is what you stated earlier.
> A. Yes.
> Q. But all of a sudden in March, when the screws were removed, the pain decreased; is that correct"
> A. In that area, yes, sir.
>
> (Def. Ex. 2, p. 67, lines 1-11).

Dr. Hammersley, who Plaintiff saw on January 21, 2016, likewise told Plaintiff the "screws were not properly in there" and it was a problem.[5] (Def.'s Ex. 2, 48:17-49:5). Plaintiff's deposition testimony confirms that he was keenly aware that the screws Dr. Hammersley installed were not properly in and that the screws were improperly done. He testified:

> Q. So Dr. Hammersley told you that the screws were not properly in there?
> A. I believe that's what he said, sir.
> Q. You don't recall Dr. Keyes ever saying anything to you about Dr. Hammersley performing an unnecessary surgery?
> A. I don't recall that; but if I can embellish for just a second, I do recall that the placement of the screws and how they weren't all the way in was improperly done. That was stated by Dr. Keyes, and that was her frustration. That's what I recall. . . .
>
> (Def.'s Ex. 2, 49:3-49:14).
>
> Q. And did Dr. Keyes then tell you subsequently that Dr. Hammersley improperly placed those screws in your left foot?
> A. That's what I recall, yes, sir.
>
> (*Id*. at 50:14-17).
>
> Q. Do you recall [Dr. Keyes] saying what portion of the surgery was unnecessary?
> A. Unnecessary or improper?
> Q. Unnecessary.
> A. I don't recall that, sir. Improper, yeah, but improper placement of the screws.
>
> (*Id*. at 50:23-51:3).

---

[5] Actually, the last time Plaintiff saw Dr. Hammersley was February 18, 2016, at a follow up visit, when he told Dr. Hammersley he was having the screws removed under the Veteran's Choice program by an outside podiatrist. (Def.'s Reply Ex. 3, p. 25). Defendant, in its memorandum, misstated that the last visit with Dr. Hammersley was January 21, 206.

6

Plaintiff identified the screws as the source of his pain to Dr. Keyes on February 16, 2016, and to Dr. Cain on April 14, 2016. (Def.'s Ex. 1, p. 23, 29-30). Plaintiff attempts to split hairs, alleging that he "does not recall Dr. Keyes ever saying anything to Plaintiff about Dr. Hammersley performing an unnecessary surgery or that the surgery was performed improperly." (Pl's Compl. ¶ 19). While perhaps she did not tell him that the surgery in its entirety was performed improperly, Plaintiff testified on multiple occasions that Dr. Keyes told him that at least part of the surgery, the placement of the screws, was "improperly done." (Def.'s Ex. 2, 49:3-49:14, 50:14-17, 50:23-51:3).

Even after the screws were out and the heel pain was better, he continued to experience other pain and functional problems with his left foot. The pain and functionality problems were so concerning to Plaintiff that he sought out yet another non-VA doctor, Dr. Cain, after refusing to go back to VA podiatry. Dr. Cain examined Plaintiff on April 14, 2016, noted several problems with his left foot and suggested Plaintiff needed yet another surgery to correct his problems. (Def.'s Ex. 1, p. 23, 29-30). By April 16, 2016, Plaintiff was so aware that Dr. Hammersley caused his injury he told a VA Social Worker that his foot was so messed up from the surgery that no one wanted to touch it and that he intended to write his Congressman.

### *Plaintiff's Other Arguments Against An Untimely Accrual of His Claim Are Not Relevant, Unsupported by the Record , and Should Be Disregarded by This Court*

Plaintiff states that the first time he was "apprised that his pain might be the result of Dr. Hammersley's care and treatment and not his own weakness and inability to recover occurred in early March 2018," when the VA contacted him to attend a meeting to discuss his care and treatment with Dr. Hammersley. (Pl.'s Compl. ¶ 21). Turning back to the timeline of events, it is undisputed that March 2018 was not the first time Plaintiff was apprised that Dr. Hammersley's care, and not his own weakness, was the cause of his pain. (*See* pp. 2-3, above). At his first

7

appointment where he complained of increased pain to Dr. Hammersley, on January 21, 2016, Dr. Hammersley identified the cause as the screw and planned for surgical removal. (Def.'s Ex. 1, p. 13). And, on February 16, 2016, Dr. Keyes confirmed the same. (*Id.* at p. 23). Thus, Plaintiff had twice been apprised of a cause other than his weakness: the screws that he subsequently had removed. (*Id.* at pp. 13 & 23).

Plaintiff next points to portions of Dr. Hammersley's deposition testimony where he stated generally that it may be difficult for a patient to identify medical malpractice[6]. (Pl.'s Resp. p. 9, ¶¶ 28-29). It is important to note that this question was not asked in the context of the specific facts and circumstances of Plaintiff's claim. (*See* Pl.'s Resp., Ex. 5, 114:4-12). Rather, Dr. Hammersley was asked "in general" if it would be difficult for a patient to differentiate between what is a normal "post-op" symptom versus an injury during surgery. (*Id.*). Dr. Hammersley was not asked what a reasonable "post-op" recovery period is. (*See id.*). Additionally, while it "may" be "difficult" to identify medical malpractice, Dr. Hammersley did not state it was impossible, or would have been difficult under the specific facts of Plaintiff's case to identify the same. (*See id.*).

Plaintiff attempts to divert the Court's attention by arguing that Veterans in related cases similarly lacked knowledge they had a claim. However, this has no bearing on what Plaintiff knew and when, and thus no bearing on when the statute of limitations in this case began to accrue. He further criticizes the VA for apologizing for the care and then denying the administrative claim.[7]

---

[6] Knowledge of negligence are irrelevant to when the statute of limitations accrues. *United States v. Kubrick*, 444 U.S. 111, 119-20, 100 S.Ct. 352, 62 L.Ed.2d 259 (1979); *Arroyo v. United States*, 656 F.3d 663, 673 (7th Cir. 2011) ("[W]hen the plaintiff knew enough (or should have known enough) to suspect that [his] injury had a doctor-related cause . . . accrual does not wait until the plaintiff learns that their injury was caused by a doctor's negligence.").

[7] While, again, irrelevant to the matter, the VA provided a brochure with the Disclosure advising the Veterans that tort claims generally accrued within 2 years of injury or death, but if the Veteran missed that date, he still had the remedy of applying for benefits for the injury. *See Def. Ex. 4, p. 2* (explaining that the Veterans could file a benefits claim at any time and receive a monthly award of benefits). Indeed, Plaintiff was aware of this and wanted to pursue his remedy when he talked with the VA social worker on April 18, 2016. (Def. Ex. 1, pp. 20-21).

8

Finally, Plaintiff asserts that the Veterans must attribute their pain to their own weakness. However, this is irrelevant, because Plaintiff was twice told the cause of his pain in the back of his heel was the screws, not his weakness, and there is no evidence to support he believed the same, such that it cannot create a genuine issue of fact.  This is especially true when another doctor, outside of the VA, told him he needed another surgery to address the pain and functionality problems with his foot. (Def. Ex. 1, p. 29).

### *Plaintiff's Alleged Reliance on Assurances by Dr. Hammersley Defense Relies Upon Misstatements of the Facts and Incomplete Portions of Deposition Testimony*

Taking the facts most favorable to Plaintiff, Plaintiff alleges that in November 2015 he was told by Dr. Hammersley that his persistent ankle pain was likely part of the healing process and would improve over time.  Plaintiff also alleges that despite the discovery of the screw, Dr. Hammersley told him that we were right where we needed to be, removal of the screws would stop the pain, and Plaintiff trusted his assessment. Plaintiff argues that these two statements create sufficient reliance on a doctor's assurances to negate any knowledge that triggers an accrual of a FTCA claim.

Plaintiff's deposition testimony contained in his reply, repeatedly misstates the record, or fails to refer to relevant material testimony.  With regard to pain during the healing process, Plaintiff gave the following testimony in response to questions:

> Q. So I assume the surgery didn't go as you expected; is that correct?
> A. No, I don't need any more time.  I didn't know it didn't go as expected.  I knew there's a healing time, there's a process.  We all go through the process.  But after, it didn't go as I expected. (Def.'s Ex. 2, p. 17, lines 22-25, and p. 18 lines 1-3).
>
> Q. I'm correct in saying that you were dissatisfied with the outcome of the surgery? Is that correct?
> A.  There's a point of time where it becomes dissatisfied. Outside of that how would you you know. (Def.'s Ex. 2, p18, lines 4-9).

9

Regarding the screw, Plaintiff alleges "[d]espite the discovery of the screw, Dr. Hammersley told Plaintiff that we were right where we needed to be and Plaintiff trusted Dr. Hammersley's assessment." (Pl.'s Compl. ¶ 13). Plaintiff omits from this allegation that he went on to testify that Dr. Hammersley told him "that the screws may not have been in or something like that. But *other than that*, we were right where we needed to be." (Pl.'s Ex. 4, p. 7 (61), lines 8-14). Even Plaintiff recognized that Dr. Hammersley did, in fact, inform Plaintiff that they were *not* where they "needed to be" with respect to the screws. (*Id*.)

Plaintiff's alleged reliance on the statements of Dr. Hammersley is both unsupported by the record and unreasonable, the most evident reason being that Dr. Keyes subsequently told Plaintiff that Dr. Hammersley improperly inserted the screws. (Def.'s Ex. 2, 49:3-49:14; 50:14-17; 50:23-51:3). Plaintiff has identified no medical opinion or advice following his visit with Dr. Keyes to corroborate any reasonable belief that the insertion of the screws was other than "improperly done."

In light of the information Dr. Keyes shared, Plaintiff's alleged reliance on the statements Dr. Hammersley made prior to his visit with Dr. Keyes in not reasonable. However, if the Court is willing to assume, *with no evidence or with unsupported argument*, that Plaintiff disregarded or disbelieved Dr. Keyes' statement, his argument still falls short of establishing reasonable reliance. Plaintiff hangs his argument on two facts: that Dr. Hammersley told him they were where they needed to be and that Plaintiff believed once the screws were removed he would feel better. (Pl.'s Br. p. 16). Plaintiff's argument again is based on a misstatement of the facts.

To accept Plaintiff's argument that Dr. Hammersley told Plaintiff they were where they needed to be, the Court would have to ignore Plaintiff's own understanding of Dr. Hammersley's medical advice. Plaintiff's testimony in its entirety was that Dr. Hammersley told him "the screws may

10

not have been in or something like that. But *other than that*, we were right where we needed to be." (Pl.'s Dep. p. 61:8-14); *see also* Ex. 1, p. 13 (1/21/16 medical records). Thus, the very medical opinion on which Plaintiff purports to have relied did not provide the assurances Plaintiff's counsel asserts. Moreover, Plaintiff's understanding that his pain in the back of his heel would not end until the screws were removed only further corroborates that he identified the screws as the cause of his pain, such that his injury had a doctor-related cause[8]. To the extent Plaintiff alleges that he inferred from this statement that his pain was a normal part of the recovery process, his inference is unreasonable. There is no relationship between a doctor's prospective statement of a potential cure to support that the retrospective cause was not doctor-induced, particularly where that same doctor told him the pain existed not because of his recovery, but because the screws were "not properly in there." (Def.'s Ex. 2 49:6-49:14; 50:14-51:3). Nor, is it reasonable to believe that painful, protruding screws are a "normal" part of the healing process. Any conclusion Plaintiff reached that his pain had a cause other than the screws was contradictory to his doctor's statement, and illogical.

In support of his argument, Plaintiff argues that a number of courts have held that a plaintiff can reasonably rely on the medical advice and assurances of their doctors. However, none present circumstances similar to the one at hand. Plaintiff relies on *Drazan v. United States*, 762 F.2d 56 (7th Cir. 1985), *E.Y. ex. Rel Wallace v. United States,* 758 F.3d 861 (7th Cir. 2014), and *Nemmers v. United States*, 795 F.2d 628 (7th Cir. 1986), for the proposition that he was not required to engage in a "paranoid" investigation of the cause of his foot pain because he received reassurance

---

[8] Plaintiff further attempts to inject a genuine issue of material fact where there is not one. He argues that there is a question as to whether Plaintiff even understood what Dr. Hammersley was going to do to his foot. Even if the Court accepted this as true, the record remains undisputed that prior to July 23, 2016, Plaintiff understood that Dr. Hammersley installed screws and they were "improperly done" and "a problem." (Def.'s Ex. 2, 49:3-49:14, 50:23-51:3). Plaintiff does not dispute the same.

that the pain he experienced was normal. However, these cases are inapposite of Plaintiff's. Each presented a situation where there were multiple potential causes to plaintiff's injury, such that each plaintiff needed his or her medical records to discern the injury and its cause. *See Drazan*, 762 F.2d at 57 (determining that statute of limitations began to run only after plaintiff obtained medical records where plaintiff had no means to know without the records that decedent's lung cancer was discovered a year earlier and was not treated); *EY ex rel Wallace*, 758 F.3d at 866 (considering "when a medical malpractice claim under the FTCA accrues when there are multiple potential tortfeasors" where plaintiff was born with an injury); *Nemmers*, 795 F.2d at 633 (remanding to determine whether plaintiff had reason to suspect that the physician's actions, rather than the natural result of child birth, caused plaintiff's cerebral palsy). Indeed, *Drazan* suggested that an opposite outcome may be true where, as here, there is only one feasible cause:

> The cause of which a federal tort claimant must have notice for the statute of limitations to begin to run is the cause that is in the government's control, not a concurrent but independent cause that would not lead anyone to suspect that the government had been responsible for the injury. The notice must be not of harm but of iatrogenic harm, though, as *Kubrick* holds, not necessarily of *negligent* iatrogenic harm.

*Id*. at 59[9].

Notably Plaintiff has not identified a single case where the plaintiff was twice told that part of the surgery was improperly done and he received no subsequent assurances to the contrary. Nor can he establish that his situation demands the same outcome as the cases he cites. Plaintiff's pain was not naturally occurring as was the lung cancer in *Drazan*; it existed only after Dr.

---

[9] Plaintiff also cites to cases where other Circuit Courts have addressed reliance on a medical opinion. See Pl.'s Br. pp. 14-15. Again, none are relevant to the circumstances presented here. *Otto v. Nat'l Inst. of Health*, 815 F.2d 985, 989 (4th Cir. 1987), concerns when the statute of limitations accrues under the continuous treatment doctrine. Plaintiff did not see Dr. Hammersley after February 18, 2016, such that the continuous treatment doctrine does not apply. Plaintiff also referred to *Nicolazzo v. United States*, 786 F.2d 454 (1st Cir. 1986) and *Raddatz v. United States*, 750 F.2d 791, 796 (9th Cir. 1984), which concern a doctor's failure to diagnose and treat an injury, not a situation where plaintiff experienced a deteriorating change in condition following a surgery and the doctor told him the cause, such that he could suspect the doctor's role and should have inquired.

Hammersley installed a foreign hardware in Plaintiff's foot. Plaintiff's case, likewise, is not akin to those concerning injury at childbirth as Plaintiff was aware of his condition before surgery such that his newly developed pain and other physical changes and limitations after surgery could be attributed only to one cause—the screws.

While it may be true that every failed surgery is not a negligent one, prompting further inquiry (Pl.'s Br. p. 18), this does not support the conclusion that no reasonable person would suspect a doctor-related cause under the circumstances. *See* p. 8, n. 6, above (explaining that negligence is irrelevant). The cases Plaintiff points to simply do not involve a situation where plaintiff saw one doctor, that doctor performed surgery, the injury occurred immediately following that surgery, there were no potential alternative causes identified, *and he was told that something installed during the surgery caused his pain and had to be removed*. Contrary to the cases on which he relies, Plaintiff was not required to engage in the "draconian exercise" of requesting medical records of a "paranoid investigation" to suspect that Dr. Hammersley had a role in causing his pain; he was told as much. See *Lumpkin*, 791 F.Supp. at 750.

In sum, Plaintiff cannot defeat summary judgment and feasibly claim that he associated the pain with a normal recovery period based on medical assurances when the record is devoid of any such assurances after January 21, 2016, and instead reflects that he was twice informed that the position of the screws caused his pain.

### *Plaintiff Has Failed to Meet His Burden To Show That His Claim Should be Equitably Tolled.*

Plaintiff has failed to identify any basis to support the equitable tolling of his claim. As Plaintiff acknowledges, equitable tolling only applies where the plaintiff was "prevented in some extraordinary way from filing his complaint in time." *Threadgill v. Moore U.S.A., Inc*, 469 F.3d 848, 850(7th Cir. 2001). The courts have allowed equitable tolling where the claimant "has actively

13

pursued his judicial remedies . . . or has been induced or tricked by his adversary's misconduct into allowing the filing deadline to pass." *Id.*

As argued in detail above, the record is undisputed that Plaintiff had all of the information necessary to pursue his claim prior to July 23, 2016. Plaintiff makes his bold claim that the VA intentionally concealed information without even identifying the information the VA had specific to Plaintiff's care that it is alleged to have concealed. Plaintiff also attempts to argue that because the VA had some concerns about Dr. Hammersley in October 2015, it should have notified him before his statute of limitations had run. (*See* Pl.'s Resp., p. 10, ¶ 33). Once again, Plaintiff's attempts to mislead the court with this allegation of fact. Plaintiff references the deposition testimony of Nicole Gust at pages 3(43) through 5(45) to support the allegation in ¶ 33 of his evidence that several VA employees raised concerns about Dr. Hammersley in October, 2015. However, this misstates the deposition testimony. The following question and response is actually given by Nicole Gust:

> Q: Ok do you happen to know the earliest date that **one** of these people started raising concerns about Dr. Hammersley's surgical cases? (emphasis added)
> A: Yes it was around September, October of 2015. (Pl. Ex. 6, p. 5(45), lines 12-17).

There is nothing in the deposition testimony that supports that all the individuals listed in ¶ 33 had concerns in October 2015. Further, Plaintiff's Exhibit 10 supports the conclusion that in the fall of 2015, it was just Aimee Bierbaum bringing concerns to John Burns about Dr. Hammersley. (Pl. Ex. 10. p. 3(2)). In fact, the initial review took place in April 2016, and it was only five case. (Def.'s Ex. 5, pp. 61-62). The rest of the review took place after the two year statute had expired in Plaintiff's case. Further, Plaintiff does not allege that the VA, in October of 2015, or April of 2016, had any negative information as it related to his care specifically. Also, no evidence has been submitted by Plaintiff to show that his case was reviewed prior to the time his statute of limitation

14

had run.  In fact, the only evidence that Plaintiff provided in his response, shows his case was reviewed on January 21, 2018. (See, Pl.'s Ex. 7).  Therefore, there are no facts to support the circumstance that VA even knew of improper care concerning plaintiff, and induced or otherwise prevented him from filing a timely claim.

Plaintiff's assertion equally falls short on evidence to support that the VA intended to induce or trick the Plaintiff.  No evidence has been presented by Plaintiff that the VA engaged in fraud, concealed any requested information, changed or destroyed records, or engaged in any other misconduct that prevented Plaintiff from acting on the information he knew prior to July 23, 2016.  As such, there were no "extraordinary" circumstances to support Plaintiff's claim.

## CONCLUSION

The record is well-established that Plaintiff was aware long before July 23, 2016, that he had an injury that was caused by Dr. Hammersley.  Plaintiff's claim, filed on July 23, 2018, was untimely, and summary judgment must be granted in favor of the United States.

Respectfully submitted,

THOMAS L. KIRSCH II
UNITED STATES ATTORNEY

By: /s/ *Lauren Waxler*
    Lauren Waxler
    Assistant United States Attorney
    Northern District of Indiana
    5400 Federal Plaza, Suite 1500
    Hammond, IN 46320
    Telephone: (219) 937-5690
    Fax: (219) 937-5500
    Email: lauren.waxler@usdoj.gov

By: /s/ *Deborah M. Leonard*
    Deborah M. Leonard

Assistant United States Attorney<br>
1300 South Harrison Street, Room 3128<br>
Fort Wayne, IN 46802-3489<br>
Telephone: (260) 422-2595<br>
Facsimile: (260) 426-1616<br>
E-mail: deborah.leonard@usdoj.gov